Dorothy E. BROWN and Donald Lee Brown and United States National Bank of Oregon, Co-Trustees under trust agreement dated April 10, 1962, sole residuary legatees of the estate of Clay B. Brown, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 67–283.

United States District Court
D. Oregon.

Oct. 17, 1968.

William H. Kinsey and Stephen B. Hill, Portland, Or., for plaintiffs.

Jerome Fink and Edward Ord, Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Portland, Or., for defendant.

## OPINION

SOLOMON, Chief Judge:

The residuary legatees of the estate of Clay Brown filed this action to recover additional income taxes which the Commissioner of Internal Revenue (Commissioner) assessed for the year 1956. The Commissioner taxed as ordinary income the difference between the acquisition price and the fair market value of stock which Mr. Brown (taxpayer) acquired by exercising an employee stock option. The Commissioner asserts that the option was not a "restricted stock option" within the meaning of Section 421 of the Internal Revenue Code of 1954, 26 U.S.C. § 421.

For a stock option to be "restricted" its exercise price must be at least 85 per cent of the fair market value of the stock at the time the option is granted. An employee who receives a restricted stock option recognizes no income when he exercises it. He is entitled to capital gain treatment on the profit if he does not dispose of the stock within two years from the date the option was granted. If the option is modified, a new option is considered to have been granted on the date of the modification. 26 U.S.C. § 425(h) (1).

Taxpayer was the president of M and M Wood Working Company (M & M). On October 28, 1954, M & M granted taxpayer a stock option covering 10,000 shares of its stock. The option price was $9.90 a share. The parties stipulate that the option was a restricted stock option on that date.

The option could be exercised immediately for 2,000 shares, and taxpayer acquired the 2,000 shares without delay. On the remaining 8,000 shares, the agreement entitled taxpayer to purchase "2,000 shares for each successive twelve-month period or fraction thereof during which Mr. Brown is employed by this company subsequent to October 31, 1955, to and including the twelve-month period commencing November 1, 1958, such option to purchase 2,000 shares for any of the before-mentioned periods of employment to be exercisable by Mr. Brown *not earlier than the October 31 immediately following the twelve-month period (or fraction thereof) of Mr. Brown's employment giving rise to such option * * *.*" (Emphasis added.)

On May 26, 1955, the directors of M & M revised the option agreement for the remaining 8,000 shares. The revision eliminated the need for taxpayer to wait until the following employment year before exercising the right to purchase each installment of 2,000 shares. For the 2,000 shares available for purchase for the period November 1, 1955, to October 31, 1956, the taxpayer could purchase them after November 1, 1955, if he were employed after

that date, rather than wait until after October 31, 1956. On the date of this revision the fair market value of the stock had increased to $16.00 a share. The $9.90 purchase price was therefore less than 85 per cent of the fair market value.

On November 15, 1955, the taxpayer exercised the revised option and acquired 2,000 more shares.[1]

On May 3, 1956, the directors of M & M approved an offer by Simpson Redwood Company (Simpson) to purchase the assets of M & M and also approved the plan of liquidation in the offer. Stockholder approval was obtained.

On August 17, 1956, Simpson deposited the full purchase price for the account of M & M, and on the same day M & M irrevocably placed the money in escrow for immediate distribution to its stockholders upon surrender of the stock certificates. On December 12, 1956, taxpayer surrendered his 4,000 shares and received his share of the money.

The Commissioner asserts that the taxpayer disposed of his stock on August 17, 1956, the date of the deposit, rather than on December 12, 1956, the date the taxpayer received the money. Since less than two years had elapsed between the date of the option and this earlier date, the Commissioner contends that the restricted stock option provisions do not apply. The Commissioner also contends that the option was modified on May 26, 1955, and even if the taxpayer did not dispose of his stock until December 12, 1956, the 2,000 shares acquired under the revised option were disposed of within the two year period.

The taxpayer contends: (1) The term "disposition" does not include an exchange pursuant to a liquidation and that he was not required to comply with the two year minimum; (2) He did not dispose of his stock until December 12, 1956; (3) Acceleration of the date at which an option can be exercised does not amount to a modification; (4) If the option was modified on May 26, 1955, then the second 2,000 shares were obtained under a nonrestricted stock option and the difference between fair market value and exercise price should have been taxed as ordinary income in 1955 rather than in 1956.

(1)

Taxpayer argues that the two-year disposition requirement is inapplicable to dispositions occurring by way of an exchange of stock for cash pursuant to liquidation of the corporate employer. The Congressional Committee Reports indicate that the policy of the two-year restriction was to insure that the favorable tax treatment given restricted stock options be available only for bona fide incentive devices. If the optionee could not dispose of his stock for at least two years he would retain a sufficient interest in the business to insure that he would use his best efforts in performing his tasks. S.Rep. No. 2375, Part XI(B) (3), 81st Cong. 2d Sess. (1950). Taxpayer argues that this policy would not be promoted by denying the favored tax treatment where a liquidation occurs within the two years, at least where the optionee is not a controlling stockholder and is not in a position to force a liquidation.

Section 425(c) provides that "the term 'disposition' includes a sale, exchange, gift, or a transfer of legal title * * *" 26 U.S.C. § 425(c). Section 331 provides that "[a]mounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock." 26 U.S.C. § 331(a). I therefore believe that the term "disposition" includes a liquidation. Taxpayer appears to argue that Congress forgot to exclude section 331 from the two-year limitation, and that we should recognize this error by excluding it from the restriction. Section 425 specifically exempts other sections from the operation of that restriction. 26 U.S.C. § 425(c). A Court will not look to legislative history if the statute is

---

[1]. On May 24, 1956, taxpayer released all his rights to acquire the remaining 6,000 shares.

clear on its face. United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1939); Hatfried, Inc. v. Commissioner, 162 F.2d 628 (3d Cir. 1947).

(2)

Taxpayer next contends that he did not dispose of his stock until December 12, 1956, which is more than two years from the date the option was granted (October 28, 1954). The Commissioner asserts that the disposition occurred on August 17, 1956. On that date M & M irrevocably deposited the funds in escrow for immediate distribution upon surrender of the stock certificates. The Commissioner relies on the doctrine of constructive receipt.

■ To support his contention that the constructive receipt doctrine is inapplicable, taxpayer cites First American National Bank of Nashville v. United States, 209 F.Supp. 902 (M.D.Tenn. 1962). In that case, taxpayers agreed to sell stock which they acquired through the exercise of a restricted stock option. To avoid the two year disposition limitation, the parties entered into a revocable escrow agreement, with the closing to occur beyond the two-year point. The Court held that the doctrine of constructive receipt did not apply and therefore there was no disposition until the closing. The case is clearly distinguishable; here we are dealing with an irrevocable rather than a revocable escrow agreement.

Taxpayer also contends that the constructive receipt doctrine is inapplicable since the doctrine presupposes an agreement by the specific stockholder to exchange his stock for money. He argues that the doctrine will not supply an agreement to exchange where none existed. It is not necessary to decide whether taxpayer is correct in this assertion. I find sufficient evidence that he agreed to the sale of assets and liquidation of M & M prior to August 17.

■ On the date of the stockholders' meeting at which the sale and liquidation were approved, there were issued and outstanding 1,432,821 shares of M & M stock. Of this number, 1,314,696 shares were represented at the meeting. Taxpayer was present at the meeting, and owned at least 4,000 shares at the time. There were 1,310,425 votes in favor of the sale and liquidation and 1,820 against. There were 2,451 abstentions, 2,431 of which were not qualified to vote. To find that taxpayer did not vote for the sale and liquidation would require an assumption that some but not all of his shares were not qualified to be voted, and that some of his qualified shares were voted in opposition to the sale. There is no evidence that any of taxpayer's stock was not qualified. As president of M & M, taxpayer negotiated the transaction with Simpson. As a director, he voted for the sale and liquidation. I find that as a stockholder he also voted for it and that he is now precluded from repudiating the transaction and refusing to accept payment for his stock.

(3)

■ Taxpayer disputes the Commissioner's contention that the revision of the option on May 26, 1955, constituted a modification. On May 26, the board of M & M altered the option by providing that taxpayer need not wait until after the end of the year to which the annual option related before he exercised it. In other words, the revision merely accelerated the time of exercise.

Prior to 1964, Treasury Regulations treated such an acceleration as a modification. Treas.Reg. § 1.421–4(c) (1). In 1964, Congress amended the definition of "modification" in section 425 to provide that a mere acceleration of the time at which the option may be exercised is not a modification. 26 U.S.C. § 425(h) (3) (C). The new definition of modification applies to tax years after December 31, 1963. The taxpayer argues that there is no evidence that Congress thought it was changing existing law when it amended the definition of modification and that the amended

definition should be treated as having been the law in 1955. We cannot accept taxpayer's reasoning. The Senate report accompanying the bill states that "[t]he new subparagraph (C) added by your committee provides an additional exception to the definition of the term 'modification.' This new exception provides that a change in the terms of an option which is not immediately exercisable in full to accelerate the time at which the option may be exercised is not a modification for purposes of section 425(h)." S.Supp.Rep. No. 830, 88th Cong. 2d Sess. (1964), U. S. Code Cong. & Admin.News 1964, p. 1910.

### (4)

The tax year before this Court is 1956. Taxpayer contends that if the acceleration in date resulted in a modification of the stock option, the profit from the option would be taxable as ordinary income in 1955, the year it was exercised.[2] Taxpayer therefore argues that he is entitled to a refund of the 1956 tax, and it is unfortunate for the government that the statute of limitations on the 1955 tax has run.

The Commissioner contends that this Court is not the proper place to raise for the first time the claim that if the 1955 revision was a modification, then the tax should have been assessed in 1955 rather than in 1956. The Commissioner argues that the taxpayer may pursue only those theories which he raised in his claim for a refund.[3]

The taxpayer did not add an additional ground for a refund after filing his original claim. He argues that advancing his income to 1955 was a mere consequence of the government's theory. We believe that under the peculiar facts of this case, the taxpayer in good conscience should have divulged additional information and his failure to do it estops him from making the claim that 1956 was not the proper tax year. The facts surrounding the 1955 revision were peculiarly within the taxpayer's knowledge; the government had no way of knowing of the board's action. This is not a case in which the taxpayer innocently believed that the revision could have had no tax consequences. On March 2, 1956, he wrote to the M & M directors:

"* * * It has come to my attention that the Board may not have intended [the] May 26, 1955, resolution as a mere clarification or correction of the prior resolution with the result that the May 26, 1955, resolution might be considered a modification of the earlier resolution. I do not desire a modification of the original resolution since a modification may jeopardize capital gain treatment under the option * * *."

In all the years since the revision taxpayer failed to inform the Commissioner that the disallowance of his claim under the restricted stock option would create additional income in 1955. Taxpayer

2. Treas.Reg. § 1.421–6(d). On the date of the modification the price at which the option was exercisable was less than 85 per cent of the fair market value of the stock, and therefore the option could not qualify as a restricted stock option. The result is that the difference between the fair market value and the exercise price is taxed as ordinary income in 1955—the year the option was exercised. Dean Babbitt, 23 T.C. 850 (1955).

3. Section 7422(a) provides:
"No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected * * * until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof." 26 U.S.C. § 7422(a).
The regulations provide: "No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth in detail each ground upon which a credit or refund is claimed and the facts sufficient to apprise the Commissioner of the exact basis thereof * * *" Treas. Reg. § 301.6402–2(b).

**532**

cannot make that claim now. A taxpayer owes a duty of consistency to the Commissioner. Building Syndicate Co. v. United States, 292 F.2d 623 (9th Cir. 1961). If the taxpayer remains silent on facts which he knows affect his tax liability, and the government does not have access to those facts, the taxpayer may not assert the true facts if it would cause a loss of revenue to the government. Robinson v. Commissioner, 100 F.2d 847 (6th Cir. 1939), cert. denied, 308 U.S. 567, 60 S.Ct. 81, 84 L.Ed. 476 (1939).

I find that the additional tax was properly assessed and that plaintiffs' action for a refund of taxes should be dismissed.

This opinion shall serve as findings of fact and conclusions of law under Rule 52(a) Fed.R.Civ.P.